### JOHN JACKSON v. THE STATE.

No. 4657. Decided December 5, 1917. ·

**1.—Occupation—Intoxicating Liquors—Indictment—Limitation.**

An indictment charging defendant with engaging in the occupation of selling intoxicating liquor in prohibited territory embraces a period of time of three years prior to and up to the date of the filing of the indictment, and evidence of such offense is admissible thereunder.

**2.—Same—Sufficiency of the Evidence.**

Where, upon the trial of unlawfully pursuing the occupation of selling intoxicating liquor in prohibited territory the evidence sustained the conviction, there was no reversible error.

**3.—Same—Evidence—Other Transactions.**

Upon trial of pursuing the occupation of selling intoxicating liquor in prohibited territory, there was no error in admitting testimony that some time after the alleged offense when witness purchased whisky from the defendant, that he had on hand five or six quarts at one time and seven or eight pints at another.

**4.—Same—Evidence—Other Transactions.**

Upon trial of following the occupation of selling intoxicating liquor in prohibited territory, there was no error in permitting testimony that defendant received from the express company several shipments of whisky during 1915, as the offense embraced the whole period of time from the date of the filing of the indictment to three years prior thereto.

**5.—Same—Evidence—Other Transactions.**

Upon trial of pursuing the occupation of selling intoxicating liquor in prohibited territory, there was no error in refusing to permit a witness for the defendant to testify that while he was working for the express company white people often ordered whisky in the name of. negroes,· etc., and hunted them up afterward to come and sign for it, as this had no connection with defendant.

Appeal from the District Court of Morris. Tried below before the Hon. J. A. Ward.

Appeal from a conviction of unlawfully pursuing the occupation of

selling intoxicating liquor in prohibited territory; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Henderson & Bolin,* for appellant.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On question of other transactions: Drye v. State, 55 S. W. Rep., 65; Starbeck v. State, 53 Texas Crim. Rep., 192; McCuen v. State, 75 Texas Crim. Rep., 108, 170 S. W. Rep., 738; Byrd v. State, 69 Texas Crim. Rep., 35, 151 S. W. Rep., 1068; Wilson v. State, 69 Texas Crim. Rep., 567, 154 S. W. Rep., 571; Brown v. State, 72 Texas Crim. Rep., 33, 160 S. W. Rep., 374.

PRENDERGAST, JUDGE.—Appellant was convicted of unlawfully engaging in the business or occupation of selling intoxicating liquor in prohibition territory, and assessed the lowest punishment.

The indictment laid the offense as committed on or about July 1, 1915, and alleged sales to given persons on that date and on December 25, 1915, and March 26, 1916. The indictment was not preferred until April 18, 1916. Of course, the offense laid would embrace a period of three years prior and up to the date of the filing of the indictment.

Prohibition was admitted to have been in effect in said county for more than three years before the indictment herein was filed.

J. T. Sewell, agent of the express and railroad companies at Daingerfield, produced his books and therefrom testified to deliveries of whisky to appellant as follows: In 1915: June 17th, 4 quarts; August 7th, 4 quarts; October 1st, 4 quarts; October 10th, 6 quarts; October 18th, 4 quarts; October 23rd, 2 quarts; November 2nd, 24 pints; November 8th, 12 quarts; November 12th, 24 pints; November 16th, 24 pints; November 22nd, 12 pints; November. 26th, 8 quarts; December 2nd, 24 pints; December 7th, 24 pints; December 11th, 12 quarts; December 17th, 6 quarts, making in all sixteen separate and distinct shipments and deliveries to him in six months and aggregating 128 quarts. Then in 1916; January 4th, 6 quarts; January 10th, 12 quarts; January 17th, 12 quarts; February 11th, 6 quarts; February 14th, 12 quarts; February 25th, 6 quarts; March 8th, 12 quarts; March 24th, 6 quarts; March 30th, 4 quarts, making in all eleven separate and distinct deliveries within three months, and a total of 94 quarts.

Raymond Rhody, to whom sales were alleged to have been made, swore that on December 26, 1915, he bought two pints of whisky from appellant—as we understand, this was two separate and distinct sales of a pint each on said date; that on March 26, 1916, he bought another part of a bottle from appellant and paid him six bits therefor; that at the first time he bought the whisky, appellant had four or five quarts on hand, and at another time he bought from him he had seven or eight pints on hand; that the whisky was in a box, in his place of business,

under a counter, and at the time appellant was selling things to eat.

Mr. Sewell swore that the express company's books which he produced and from which he showed the several deliveries to appellant were the books kept expressly for whisky shipments; that the collect packages were kept in one and the prepaid packages in another book; that to those receipts of shipments appellant's name was signed and that said records showed it to have been in different handwritings; that he did not know who signed for the packages where these different handwritings were signed. He said: "I have known of instances and have had several people come around and ask if John Jackson had any whisky there. Then later on Jackson would come and get the whisky. I have had that to occur a number of times." On redirect examination he swore: "If whisky is consigned to John Jackson, John Jackson will have to come and sign for it. The consignee has to come and sign for the whisky. With reference to those inquiries I don't know whether or not they wanted Jackson to·get it out so that they could buy some. They may have made the inquiry in order to purchase it from him for all I know."

Appellant himself testified and swore in effect that he had the said shipments of whisky made to him. He claimed, however, that the whisky was not always for himse'f, that some of it was for other people—white friends of his. He denied ever having sold any whisky at any time to said witness Rhody. On cross-examination he swore that in the summer time he ran an ice cream parlor and in the winter time ran a restaurant and sold stews and chili; that he did not order and get and sign for all the whisky shown by the express company's books; that there was some came for him that he knew nothing about and never signed for at all; that he drank some of the whisky but not all, it was not all his. He said: "I did not order whisky for white people, but they asked me if they could use my name and send my name to the whisky houses. Then they would get me to go and get it out. I can name some of the men who did that, but I don't want to leave here; I would like to stay. I can name some of the men I got whisky for, but I don't want to." He claimed to have gotten some for Mr. Heard, and he said that Mr. Heard was one who ordered whisky in his name, and that Mr. Joe Bradfield was another; that he did not know how many times he had ordered it for Mr. Bradfield. He said: "I don't know of any others except those two who got whisky in my name; that is all I can think of, just those two men." That he thought Mr. Heard got whisky in the way he said in his name, about ten or fifteen times. He swore that lots of days he did not drink much whisky and sometimes went a week at a time and never drank a drop and sometimes a month at a time without drinking.

Mr. Heard testified that he did not use appellant's name ten or fifteen times in ordering whisky for himself. He swore that sometimes he and others got together and ordered as much as a case at a time, and

he said some of the boys might have ordered it through appellant. On cross-examination he said that he never ordered a case from appellant in his life; that he may have had some whisky in an order but never as much as four quarts; that he never got any in pints.

The evidence was undoubtedly sufficient to sustain the conviction.

The court was correct in permitting the said Rhody, over appellant's objection, to testify that on March 26, 1916, when he bought some whisky from appellant that appellant then had on hand five or six quarts of whisky; and that at another time when he bought from him that he had on hand seven or eight pints of whisky. That testimony was clearly admissible.

The respective dates and quantities of whisky received by appellant from the express company is shown above. He objected to the proof that on June 17, 1915, he got four quarts, on August 7th four quarts, and on October 1st four quarts, on the ground that said testimony was immaterial and the deliveries too remote from the offense charged. The court explained in his approval of the bill that because appellant was charged with pursuing the business or occupation as stated he admitted the receipt by him of the large quantities of whisky as tending to show he was engaged in the business at the time charged. As stated above, the offense was laid on July 1st, but embraced the whole period from the time the indictment was filed for three years before. These three respective shipments to which he objected were clearly not too remote and were admissible for the purpose as stated by the court. The court did not err in refusing to permit the witness Sewell to testify as shown by another bill of appellant's that while he was working for the express company at Daingerfield he knew it to be a fact that white people often ordered whisky in the name of negroes and then came to said express office and got it out, or found out whether it had come and then went out and hunted the negroes up and had them come in and sign for it, and that appellant was a negro. This testimony of what others did having no connection with appellant, was properly excluded.

The judgment is affirmed.

*Affirmed.*